# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF VIRGINIA

NIA LUCAS
6218 GEORGIA AVENUE NW
STE 1 - 488
WASHINGTON DC 20011-5125,

And

ALEXANDER MILLER II,
a minor, by and though his Guardian ad
Litem, NIA LUCAS
6218 GEORGIA AVENUE NW
STE 1 - 488
WASHINGTON DC 20011-5125,

                Plaintiffs

                v.

VHC HEALTH
DBA VIRGINIA HOSPITAL CENTER
1701 N. GEORGE MASON DRIVE
ARLINGTON, VIRGINIA 22205,

And

VHC PHYSICIAN GROUP, LLC.
DBA VHC HEALTH PHYSICIAN/OBGYN
1625 N. GEORGE MASON DRIVE, SUITE 325
ARLINGTON, VA 22205,

Serve: Alexander Eremia
       Virginia Hospital Center
       1701 N. George Mason Dr.
       Arlington, VA  22205,

                Defendants

Civil No. :  1 : 22 cv 987

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Nia Lucas and Alex Miller, states and alleges as follows:

1

**INTRODUCTION**

1.      This is an action to secure relief for violations of rights guaranteed by the Patient Protection and Affordable Care Act § 1557, 42 U.S.C. § 18116 ("Section 1557") .

2.      In August 2018, Plaintiffs Nia Lucas ("Plaintiffs" or "Ms. Lucas") and Alex Miller ("Plaintiffs" or "Mr. Miller") an expectant mother and her fetus, sought emergency care at VHC Hospital Center Labor and Delivery, then known as the Virginia Hospital Center ("VHC") for pre-term contractions and pain associated with her singleton pregnancy. VHC is owned and operated by VHC Health, Inc. ("VHC Health").  VHC accept Ms. Lucas in-patient, however, she was discharged with contractions untreated and unrecovered, in opposition her VHC Maternal Fetal Medicine (MFM) provider Nisha Vayas', MD medical recommendation. VHC physicians Dr. Katherine ("Dr. Burt"), MD among others did not treatment her pre-term contractions and discharged her without any treatment of medication for pre-term contracts or pain. The Plaintiffs were provided a class-C drug, Ambien, known to be prescribed to women in labor and know to increase symptoms of depression. VHC physicians did not provide the recommended dosage of Indocin as prescribed by the Plaintiffs' MFM (again also a VHC physician) to stop the pre-term contraction that could lead to life threatening pre-term labor for the Plaintiffs.

3.      Upon discharge VHC physician informed the Plaintiffs to follow up with her MFM during there regularly schedule appointment in 48 hours. For 48 hours Ms. Lucas was sleepless, ravaged with pain, experiencing pre-term contract 1 to 2 mins apart, as well as, emotionally injured by the life-threatening symptoms that could end her life and her unborn son.

4.      During the Plaintiffs' follow-up with her MFM in 48 hours, her MFM sent the Plaintiffs again to VHC Labor and Delivery for pre-term contractions and pain that was untreated by the VHC prior. The MFM again informed the physicians that Ms. Lucas required treatment and if Indocin was not going to prescribed at the minimum Procardia, a drug known to

2

mitigate and or stop pre-term contractions.

5.      The VHC physicians on rotation were not part of the Plaintiffs' VHC OBGYN

care team, as they had been previously, which included Dr. Burt, MD. Known the less they

proscribed Procardia.

6.      Within a week of being in-patient at the VHC, Ms. Lucas was dismissed by VHC

Physician Group and the VHC for reporting to her Dr. Saira Mir, MD (OBGYN physician), Dr.

Kelly Orzechowski, (MFM physician) MD, as well as Kelly White (a business manager for the

VHC Physician Group/OBGYN) that she (Ms. Lucas) was receiving disparate care from White

patients, because of her race and that of her son (African American) and her service-connected

disability (PTSD and depression). Ms. Lucas explained her unadulterated  disbelief and outrage

that she was told to miscarry at home, and that she may do so in her sleep; in the light of the

hospital refusing to treat her pre-term contractions. As well as, that she was left in severe pain by

VHC physicians, provided absolutely no treatment or prescription for pain upon discharge,

though denoted throughout her medical record that she was in pain upon discharge.

7.    In the Plaintiffs' complaint to the Defendant's Ms. Lucas conveyed that Defendant's refusal to

provide the recommended care by the MFM to include no mitigation for pre-term contracts and

discharge without pain management was based on intentional racism and discrimination. First,

there was this belief that because I was African American, I could not feel pain as another White

women and thus required no treatment for pain on discharge, not even a prescribing Tylenol.

Furthermore,  although there was clear evidence via more than one Nonstress Test (NST) administered

by VHC that Ms. Lucas was experiencing regular pre-term contractions  (not Braxton Hicks) that could

lead to pre-term labor, because she her  diagnosis of PTSD, depression, as well as panic attacks and

anxiety the Defendant's contrary to the MFM notes and the NST asserted that her physical pain was not

really and was only in her head. Consequently, Ms. Lucas was denied the recommended care by her

MFM and was denied equal accommodations, advantages, facilities, privileges, and services because of

3

not only her race, but her disability, although her stomach could be scene gathering into hard balls over fibroids and the fetus, and Ms. Lucas could be hear crying out in pain. wrongly and unlawful assumed that, because I was African American that I could withstand the contractions and pain for entire during for my pregnancy which was still had approximately three and half months.

8.     Ms. Lucas' inability to take full, equal advantage of Defendant's healthcare and its services, as well as her retaliatory dismissal after her complaint of the intentional disability discrimination, constituted unlawful discrimination in violation of 504 of the Rehabilitation Act (Section 504), Title II of the Americans with Disabilities Act as Amended (ADA), and Section 1557 of the Patient Protection and Affordable Care Act (ACA). Subsequently, after her complaint, the Defendant's retaliation, dismissing her violated the above statues.

9.     At the time she made the complaint, the Plaintiffs reiterated to VHC physicians and officials that she did not want to leave the VHC to deliver elsewhere, because of her fear of the high mortality rates in the DMV area, specifically, Washington, DC where the maternal mortality rate was higher than Syria for all women regardless of race , yet ninety (90) percent of the pregnancy related deaths were African American. Additionally, DC, the African American maternal mortality in 2018, four (4) times the national average or 2 to 3 times White mothers). Ms. Lucas in her city of residence Washington, DC. were as of this year 90 percent of the pregnancy deaths were African American

10.     Ms. Lucas also informed Kelly White at the same time she made the complaint on her behalf that she witnessed just days prior African American VHC phlebotomist traumatizing and being derogatory to a Muslim patient, who did not speak English. They were attempting to draw her blood and brandishing the needle and she was in fear, did not understand why her blood was being taking. The women could be seen vigorously trying to turn away the needle and crying. Reportedly the woman was conducting the same test as Ms. Lucas, a glucose tolerance test, which required a blood draw, but the VHC had not provided an interpreter to her to explain

4

the test.

11.    Ms. Lucas, conveyed to the Defendant's that she wanted to work with VHC and physician group as a team to see improved care for her, her son, and other mothers of various colors and creeds.

12.    In September 2018, the Plaintiffs were dismissed by the Defendant's during her high-risk pregnancy while in her third trimester; just days after making a complaint of intentional race and disability discrimination to VHC officials. During the Plaintiffs' last visit with Dr. Mir, MD, she was provided nine (9) days to find another physician, although the VHC records department had thirty (30) days to provide her the necessary medical documentation needed for her to transmit and be accept by another provider. Furthermore, the Plaintiffs were provided specialty consults for her heart, thyroid and liver that was experience complications during her pregnancy, to differing cardiologist, hepatologist and epidemiologist with absolutely no OBGYN to review or provide treatment plan, accordingly.

13.    The Plaintiffs were told they could be dismissed for any reason (e.g. race and disability), though she had complied and been exceptional patient and advocate her unborn son.

14.    During the nine (9) day period that VHC provider gave the Plaintiffs to find a OBGYN, Ms. Lucas was unable to find one. Ms. Lucas experienced rashes, extreme physical pain and emotional distress to include, but not limited to skin lofting off, racing heart rate, and anxiety.

15.    VHC and its physician group retaliated against Ms. Lucas because her complaint of intentional discrimination against her and another patient of color, that was Muslim. VHC treated the Plaintiffs with a complete lack of dignity and respect, solely due to her complaint, Defendants forced Ms. Lucas during her third trimester, where treatment was a  life or death matter for both her and her son, to  endure physical pain, humiliation, embarrassment, and distress. Defendants further needlessly ignored Ms. Lucas' physical and psychological needs for

5

her and her unborn child for which she was seeking treatment.

16.     Ms. Lucas brings this action under Section 1557 to recover damages for the harms Defendants caused her and for injunctive relief, including increased training and changes in Defendants' policies and practices, so that in the future Defendants will provide equal, nondiscriminatory and nonretaliatory consultation and treatment to all of its patients, regardless of their protected activity consistent with federal law.

## PARTIES

17.     Plaintiff, Nia Lucas is a disabled veteran, African American female whom at the time was an expectant mother of her first son, and resided in Washington, D.C.

18.     Plaintiff, Alexander Miller, is a three-year-old African American male whom at the time was Ms. Lucas' fetus.

19.     Defendant VHC, is a Virginia non-profit corporation in active status with a registered office at 1701 N. George Mason Dr., Arlington, VA 22205.
At all times relevant, VHC Health (DBA VHC) and VHC Physician Group operated various medical practice groups with offices located at 1701 N. George Mason Dr., Arlington, VA 22205.

1.      Upon information and belief, VHC and VHC Physician Group is a healthcare organization receiving federal financial assistance such as Medicare, Medicaid, credits, subsidies, or contracts of insurance.

2.      At all relevant times, Defendants employed, or held out to the public it was employing the services of doctors, nurses, and other professional and non- professional health care providers. These include the health care providers with whom Ms. Lucas requested medical treatment from in 2018.

3.      The VHC physician group described itself as, "The Virginia Hospital Center (VHC) Physician Group is a multi-specialty group comprised of over 130 members of primary

6

care physicians and a wide range of specialists located across northern Virginia. Our physicians are a part of Virginia Hospital Center, a national leader in healthcare with a proven track record of the best quality, the best value, and the overall best patient care and patient experience." on its website.

4.      Additionally, the VHC on its website describes the VHC physician group as follows: "The Virginia Hospital Center (VHC) Physician Group is part and parcel of Virginia Hospital Center. The VHC Physician Group is a diverse group of very highly selected physicians ranging from the most highly specialized surgical specialists to primary care and family practitioners who are part of the mission and vision of Virginia Hospital Center. All of us strive to provide the best and the most excellent care for our patients. The VHC Physician Group enjoys all of the expert capabilities the Hospital has to offer from the state-of-the-art facility, to Magnet status for nurses, to the latest and greatest medical equipment. All our physicians are tied into the Hospital's infrastructure with seamless integration."

5.      VHC self describes on its website as follows: "VHC Health™ has provided exceptional medical services to the Washington, DC metropolitan area for more than 75 years. A proud member of the Mayo Clinic Care Network, a national network of independent healthcare organizations, the Hospital prides itself on offering the latest technological advancements and medical practices. Virginia Hospital Center was recently designated a Newsweek 2020 Best Maternity Care Hospital, received a 5-star rating from the Centers for Medicare and Medicaid Services (CMS) and once again named a Leapfrog Top Hospital in 2019."

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) over Plaintiffs' claims arising under the Patient Protection and Affordable Care Act § 1557, 42 U.S.C. § 18116 ("Section 1557").

7

7.    Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants do business in Virginia and a substantial part of the events giving rise to Plaintiffs' claims occurred in Virginia.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    INTENTIONAL DISCRIMINATION AND DEATH OF AFRICAN AMERICAN MOTHERS AND INFANTS IN HEALTH CARE

8.    "The legacies of slavery today are seen in structural racism that has resulted in disproportionate maternal and infant death among African Americans.

The deep roots of these patterns of disparity in maternal and infant health lie with the commodification of enslaved Black women's childbearing and physicians' investment in serving the interests of slaveowners. Even certain medical specializations, such as obstetrics and gynecology, owe a debt to enslaved women who became experimental subjects in the development of the field.

Public health initiatives must acknowledge these historical legacies by addressing institutionalized racism and implicit bias in medicine while promoting programs that remedy socially embedded health disparities.

In February 2019, embattled Virginia governor Ralph Northam referred to Virginia's racist past by connecting it to the assumed healing power of medicine. Shortly after conservative political rivals published a racially offensive photo allegedly of Northam and a medical school friend in blackface, the governor responded, "Right now Virginia needs someone who can heal. There's no better person to do that than a doctor."

As a pediatric neurosurgeon, Governor Northam relied on the language of healing and the presumed belief that many Americans have that doctors are committed to curing what ails us all. Surely anti-Black racism, if thought of as a disorder, as Northam suggested, should be

8

cured by neurosurgeons who are charged to rehabilitate disorders affecting the brain." Owens

DC, Fett SM. Black Maternal and Infant Health: Historical Legacies of Slavery. Am J Public

Health. 2019 Oct;109(10):1342-1345. doi: 10.2105/AJPH.2019.305243. Epub 2019 Aug 15.

PMID: 31415204; PMCID: PMC6727302, available at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6727302/.

9.    In light of the medical field's racist past, it not be trusted that physicians and

surgeons such as Governor Northam with providing non-discriminatory and non-retaliatory care;

and this is supported by facts; statistics.

10.    "These questions acquire pressing urgency in the face of the continuing disparities

in the health and survival of Black mothers and children today. Distressingly, although infant

death rates overall have plummeted since the 19th century, the disparity between Black and

White infant deaths today is actually greater than it was under antebellum slavery. Historical

demographers estimate that, in 1850, enslaved infants died before 1 year of age at a rate 1.6

times higher than that of White infants (340 vs 217 deaths per 1000 live births).12 In

comparison, Centers for Disease Control and Prevention figures from 2016 show that today non-

Hispanic Black infant mortality is 2.3 times higher than mortality among non-Hispanic White

babies (11.4 deaths and 4.9 deaths, respectively).13

In addition, although Black women live longer lives now, the effects of racism

have reverberated in their lives and those of their children in damaging and fatal ways. Since

1994, maternal mortality has dropped by almost 50% worldwide. Yet, between 2000 and 2013,

high Black maternal death rates placed the United States second worst in maternal mortality

among 31 Organisation for Economic Co-operation and Development nations.14 In the United

States, pregnancy-related mortality is three to four times higher among Black women than among

White women.15

9

Since the 1990s, research on maternal and infant death disparities has increasingly pointed to structural racism in society at large as a stressor that harms African American women at both physiological and genetic levels.[16,17] Conditions such as hypertension, which have been linked to the stress of living in a racist society, contribute to disparities in pregnancy-related complications such as eclampsia.[18] These detrimental health effects of daily life are then further compounded by racial discrimination and disregard within medical institutions.[19]

Yet, as reproductive justice groups such as the Black Mamas Matter Alliance point out, expecting and new Black mothers often find their self-reports of painful symptoms overlooked or minimized by their practitioners.[20] It seems that, rather than addressing systemic racism in obstetrics and gynecology, medical practitioners have instead to some extent emphasized all of the ways Black women allegedly make themselves prone to being ill during their pregnancies. Black pregnant women and non–gender binary folks are told their fatness, advanced age, dietary choices, and lack of prenatal care have increased their chances of dying during childbirth. Yet, whereas Black pregnant people and mothers are made into culprits and the initiators of their deaths, doctors, nurses, and the hospitals they run are not looked at as critically as they should be." Owens DC, Fett SM. Black Maternal and Infant Health: Historical Legacies of Slavery. Am J Public Health. 2019 Oct;109(10):1342-1345. doi: 10.2105/AJPH.2019.305243. Epub 2019 Aug 15. PMID: 31415204; PMCID: PMC6727302, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6727302/.

11.    In April 2022, the Center for Disease Control acknowledging the following on its website, "Each year in the United States, about 700 people die during pregnancy or in the year after. Another 50,000 people each year have unexpected outcomes of labor and delivery with serious short- or long-term health consequences. Every pregnancy-related death is tragic, especially because **two in three of them are preventable**. Recognizing urgent maternal warning

signs and providing timely treatment and quality care can prevent many pregnancy-related deaths.

Racial Disparities Exist- Black women are three times more likely to die from a pregnancy-related cause than White women. Multiple factors contribute to these disparities, such as variation in quality healthcare, underlying chronic conditions, structural racism, and implicit bias. Social determinants of health prevent many people from racial and ethnic minority groups from having fair opportunities for economic, physical, and emotional health." Working Together to Reduce Black Maternal Mortality available at https://www.cdc.gov/healthequity/features/maternal-mortality/index.html.

12.     Additionally, the CDC suggest the health care providers do the following: "

Pregnant people and their families can:

- Hear her-Seek help if something doesn't feel right

- Talk to a healthcare provider if anything doesn't feel right or is concerning.

- Know and seek immediate care if experiencing any of the urgent maternal warning signs, including severe headache, extreme swelling of hands or face, trouble breathing, heavy vaginal bleeding or discharge, overwhelming tiredness, and more. These symptoms could indicate a potentially life-threatening complication.

- Document and share pregnancy history during each medical care visit for up to one year after delivery.

- Maintain ongoing healthcare and social support systems before, during, and after pregnancy.

11

Healthcare providers can:

- Hear her-Listening can be your most important tool. Her hear concerns. It could help save her life

- Ask questions to better understand their patient and things that may be affecting their lives.

- Help patients, and those accompanying them, understand the urgent maternal warning signs and when to seek medical attention right away.

- Help patients manage chronic conditions or conditions that may arise during pregnancy like hypertension, diabetes, or depression.

- Recognize unconscious bias in themselves and in their office.

- Address any concerns patients may have.

- Provide all patients with respectful care.

Hospitals and healthcare systems can:

- Identify and address unconscious bias in healthcare

- Standardize coordination of care and response to emergencies.

- Improve delivery of quality prenatal and postpartum care.

- Train non-obstetric care providers to ask about pregnancy history in the preceding year." Working Together to Reduce Black Maternal Mortality available at https://www.cdc.gov/healthequity/features/maternal-mortality/index.html.

## II.    MS. LUCAS AND MR. MILLER

13.    Unfortunately, Ms. Lucas experienced at VHC illustrates these injustices, which

12

Section 1557 was enacted to address. While VHC publicly boast on its website that it was designated a Newsweek 2020 Best Maternity Care Hospital and received a 5-star rating from the Centers for Medicare and Medicaid Services (CMS). This is not demonstrative of its retaliation against the Plaintiffs.

14.     Ms. Lucas at the time was thirty-five (35) year old African American female and service connected disabled veteran (diagnosed with Traumatic Brain Injury, Post-Traumatic Stress Syndrome, Depression, Anxiety and Panic Attacks) served in Operation Enduring Freedom in Afghanistan with the United States Army. )

15.     The United States Department of Veteran Affairs insured Ms. Lucas for her prenatal care at the VHC  both under Tri-west and its Community Care program.

16.     On August 24, 2018, Ms. Lucas and her partner Alexander Miller were sent to the Emergency Labor and Delivery at VHC by her VHC MFM to resolve her pre-term contractions, as well as abdominal and back pain. A cell phone with its flash light turned on was used to inspect her vagina, as well as, a medical student was permitted to check her cervix without her permission. Ms. Lucas pre-term contractions went untreated.

17.     August 25, 2018, VHC physicians discharged her without treatment of pre-term contractions and pain. They informed her to follow up with MFM in 48 hours at a regularly scheduled appointment, as well as, she was informed that if she was to miscarry to do so at home, and it potential would happen in her sleep.

18.     In around August 27, 2018, MFM returned Ms. Lucas to VHC Labor and Delivery for treatment, the attending and other physician were not part of her OBGYN as had been the case prior. The prescribed her medication Procardia to stop contraction as recommended by her MFM.  Still the staff made it clear that they believed that because of her diagnosed emotional conditions, ADA disabilities that limit one or more of her daily activities,

that she was fabricating the seriousness of the contractions and pain. In fact, in her previous visit to the VHC she was told to just live the pre-term contractions and pain for the next three and half months, and if she was to miscarry do so at home.

19.     Ms. Lucas was discharged in and around August 28, 2018, after making complaints about the intentional discrimination she and another patient experienced at VHA, because of their potential race, ethnicity, disability and religion  to VHC officials and physician groups to include but not limited to Dr. Mir, Ms. White, and Dr. Orzechowski, previously mentioned herein. Her complaint included, but was not limited her not being test and diagnosed for gestational diabetes (which is deadly to a fetus) in accord with her VHC MFM recommendations, Ms. Lucas having to request her glucose tolerance test. As well as, being given cortisone cream, when Ms. Lucas was experiencing liver function issues that had bile backing up in her blood causing her to have severe itching. This was in addition to, being provided with a diagnosis of Cholestasis by a non-medical doctor without any information on the cause or treatment. Cholestasis results in 37 percent still birth, and this severely frighten Ms. Lucas. This was all on top of the incident where her pre-term contractions and pain went untreated by the Defendants.

20.     In and around, August and September 2018 both Dr. Mir and Dr. Orzechowski, falsified there medical note to include in accurate information from the Plaintiffs to support retaliation.

21.     September 5, 2018, Ms. Lucas received a dismissal letter from the Defendants prior to her September 6, 2018, appointment with OBGYN Dr. Mir, MD. The letter dated August 31, 2018, just a two to three days from her complaint of intentional discrimination, informed her that there was no trust between she and her and the Defendant's and thus she was being dismissed and has 14 days from August 31 to find a new provider, though her medical records were not readily available so that she might find another provider.

22.    During, her September 6, 2018, appoint with Dr. Mir, MD she was informed that she was told to go and that her expectation could not be met. Furthermore, she is being dismissed, because she said she did not have time to find another doctor in her high risk pregnancy in her first trimester. All of this was captured on video with audio by the Plaintiffs' her partner Mr. Miller, who decided to record after a previous appointment when Dr. Mir, MD informed the Plaintiffs she does not take care of veterans or "Blacks".

23.    Ms. Lucas survived war to return home to have the Defendant's trying to kill the Plaintiffs and her fetus in the United States, by way of retaliation during her pregnancy in the last trimester. The Defendant's and their clients are whom Ms. Lucas fought for while in the Army, with malice and complete disregard for humanity caused her extreme physical pain and emotional distress by denying care and dismissing her for her protected activity.

24.    Mr. Miller suffering the womb is not unmeasurable, he experienced stress in the womb, and had to be delivered early at 37 weeks vs. 40 weeks due the Plaintiffs' high blood pressure associated with the physical and emotional distress inflicted on his mother by the Defendants. "A growing body of research shows that prenatal stress can have significant effects on pregnancy, maternal health and human development across the lifespan. These effects may occur directly through the influence of prenatal stress-related physiological changes on the developing fetus , or indirectly through the effects of prenatal stress on maternal health and pregnancy outcome which, in turn, affect infant health and development. Animal and human studies suggest that activation of the maternal stress response and resulting changes in endocrine and inflammatory activity play a role in the aetiology of these effects. " Coussons-Read ME. Effects of prenatal stress on pregnancy and human development: mechanisms and pathways. Obstet Med. 2013 Jun;6(2):52-57. doi: 10.1177/1753495X12473751. Epub 2013 May 3. PMID: 27757157; PMCID: PMC5052760, available at

15

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5052760/.

25.    In and around November 2018, because of blood pressure, Ms. Lucas and Mr.

Miller had to be separated after birth. Ms. Lucas was admitted to Walter Reed in Bethesda, MD

for post-partum eclampsia (transferred from VA medical facility), high blood pressure. It was

during this time and directly after the Defendants actions that Mr. Miller became jaundiced and

loss several pounds. Ms. Lucas was also unable to breast feed due to emotional stress of her

health complication associated with the Defendant's actions, which did not help matters for her

son.

26.    Since, Mr. Miller has suffered from anxiety and the long-term negative health

physical and mental effects on the Mr. Miller by the Defendants retaliation are numerous.

## COUNT I

### Disability Discrimination under Section 504 of the Rehabilitation Act 29 U.S.C. § 794

27.    Plaintiffs reallege each and every paragraph above and incorporates the same

herein.

28.    On information and belief, defendant receives federal financial assistance,

including payments by Medicare and Medicaid, research and other grants, and support from

other federal programs.

29.    At all relevant times, Plaintiffs had a physical impairment that substantially

limited a major life activity.

30.    At all relevant times, Plaintiffs were qualified to receive health services and

treatment from Defendant.

31.    At all relevant times, Defendant knew or should have known of Plaintiffs'

disabilities .

32.

16

33.     Defendant unlawfully discriminated and retaliated against Plaintiffs on the basis of Plaintiffs' disability, in one or more of the following ways:

> a.     Excluding Plaintiffs from participation in and/or denying Plaintiffs the benefits of the services, programs, and/or activities of defendant's services, programs, and/or activities;
>
> b.     Failing to provide the same standard of care ad or treatment as abled bodied persons;
>
> c.     Failing to provide as equally an effective treatment as is provided to other patients at defendant's health-care facility; and
>
> d.     Otherwise subjecting Plaintiffs to discrimination on the basis of disability and retaliatory dismissal for protected activity under the Rehab Act..
>
> e.     Defendant acted with deliberate indifference to Plaintiffs' civil rights, mental health, and welfare.

34.     Plaintiffs is entitled to equitable relief and compensatory damages.

35.     Pursuant to 42 U.S.C. § 1988(c) and 29 U.S.C. § 794a(b), Plaintiffs is entitled to her reasonable attorney fees, costs, expert witness fees, and disbursements incurred in prosecuting this claim.

## COUNT II

### Disability Discrimination under Title III of the ADA

### 42 U.S.C. § 12132, et. al.

36.     Plaintiffs realleges each and every paragraph above and incorporates them herein.

17

37.     At all material times, defendant was a place of public accommodation  and therefore subject to the Title III of the ADA.

38.     At all relevant times, Plaintiffs had a physical impairment that substantially limited a major life activity.

39.     At all relevant times, Plaintiffs were qualified to receive health services and treatment from defendant.

40.     At all relevant times, Defendant knew or should have known of Plaintiffs' disability.

41.     Defendant unlawfully discriminated against Plaintiffs on the basis of Plaintiffs' disability, in one or more of the following ways:

     a.      Excluding Plaintiffs from participation in and/or denying Plaintiffs the benefits of and equal access to defendant's services, programs, and/or activities;

     b.      Failing to provider care and or treatment for Plaintiffs , thus providing full and equal access to defendant's services, programs, or activities;

     c.      Failing to provide as equally an effective care and or treatment as is provided to other patients at defendant's health-care facility; and

     d.      Otherwise discriminating against Plaintiffs on the basis of her disability.

42.     Defendant acted with deliberate indifference to Plaintiffs' civil rights, mental health, and welfare.

43.     Plaintiffs is entitled to equitable relief and compensatory damages.

44.     Pursuant to 42 U.S.C. § 12205, Plaintiffs is entitled to her reasonable attorney fees, costs, expert witness fees, and disbursements incurred in prosecuting this claim.

## COUNT III

**Violation of the Patient Protection and Affordable Care Act (ACA)**
**42 U.S.C. § 18116, et. al. to include §1557**

45.    Plaintiffs re-alleges the foregoing paragraphs as though fully set forth herein.

46.    Section 1557 of the Patient Protection and Affordable Care Act ("ACA")

prohibits discrimination on the basis of sex in any health program or activity:

> *Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under ... title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 504 [of the Rehabilitation Act of 1973 (29 U.S.C. 794)], or such Age Discrimination Act [of 1975 (42 U.S.C. § 6101 et seq.)] shall apply for purposes of violations of this subsection. 42 U.S.C. § 18116(a).*

47.    To state a claim under Title VI herein referenced in Section 1557, a Plaintiffs

must allege: "(1) the entity involved is engaging in racial discrimination; and (2) the entity

involved is receiving federal financial assistance." The Plaintiffs alleges that the Defendant's

intentional discriminated and based on Ms. Lucas complaint of intentional discrimination

retaliated in dismissing her in close temporal proximity to the complaint. As well as the Plaintiffs

alleges that the Defendants receive federal financial assistance, to include accepting paying for

the Department of Veteran Affairs for Ms. Lucas' treatment during her pregnancy.

48.    Title VI as referenced under the ACA Section 1557 also protects individuals from

retaliation, intimidation, and coercion they may suffer for asserting their Title VI rights or

participating in a Title VI complaint, investigation, or other proceeding. Individuals are protected

against retaliation whether or not they are the targets of the underlying discrimination.

49.    Since its 1969 decision in Sullivan v. Little Hunting Park, 396 U.S. 229 (1969),

the Supreme Court has consistently recognized retaliation claims as vindicating the central anti-

discrimination principles of comparable civil rights statutes.

50.    In Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003), the Fourth Circuit held that Title VI's prohibition against racial discrimination includes a right of action against "retaliation."

51.    The actions of Defendants described herein and underlying policies of VHC constitute intentional retaliation and subsequently, invidious discrimination against Ms. Lucas on the basis of protected activity and class, in violation of Section 1557. Specifically, Ms. Lucas was excluded from participation in and was denied the benefits of treatment.

52.    The actions of Defendant's were taken within the scope of their employment with Defendants, and Defendants, as places of public accommodation and recipients of public funds are vicariously liable for the alleged acts of these employees.

53.    Specifically, the Defendants received federal financial assistance, and was accepted payment form the Department of Veteran Affairs for the Plaintiffs' treatment during her high-risk pregnancy.

54.    Other persons at VHC were aware of the retaliatory and discriminatory acts and policies, to include her dismissal for  making a complaint under Section 1557;  and acted with either deliberate intent to retaliate.

55.    Due to the life and death situation, in addition to, mental health diagnosis (PTSD and depression) of Ms. Lucas, the Defendants were on notice that both physical and emotional damages would result from there unlawful retaliation.

56.    Defendants retaliated against Ms. Lucas on the basis of her protected activity under the Title VI, which Section 1557 prohibits.

57.    Defendants' actions were malicious, wanton, reckless, and willful, and taken with deliberate intent, deliberate disregard for, or deliberate or reckless indifference to, Plaintiffs' rights.

58.     Ms. Lucas and Mr. Miller have been damaged as a result of Defendants' actions in an amount to be determined at trial, including but not limited to physical pain, embarrassment, humiliation, emotional pain and anguish, the loss of enjoyment of life, and violation of her dignity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays:

A.     That the practices of Defendants complained of herein be adjudged, decreed and declared to be in violation of the rights secured to the Plaintiffs by the Patient Protection and Affordable Care Act § 1557.

B.     That a permanent injunction be issued requiring that Defendants adopt practices in conformity with the requirements of the Patient Protection and Affordable Care Act § 1557, such as ordering appropriate after-action review on structural racism that occurred and training on racism in healthcare and to better handle patient complaints regarding intentional discrimination.

C.     That a permanent injunction be issued prohibiting Defendants from engaging in the practices complained of herein.

D.     That Plaintiffs be awarded compensatory damages in an amount to be established at trial.

E.     That Plaintiffs be awarded punitive damages.

F.     That the Court retain jurisdiction until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law.

G.     That Plaintiffs be awarded her reasonable attorneys' fees and the costs and

expenses of this action.

      H.     That Plaintiffs be awarded such other and further legal and equitable relief as may

be found appropriate, just, and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues triable of right by a jury.


Respectfully submitted this 25th day of August 2022.

/s/
NIA S.LUCAS
6218 Georgia Avenue NW
STE 1-488
Washington, DC 20011-5125
Integritynhonor4ever@gmail.com
Telephone: (571) 308-3198
Facsimile: (202) 585-0065

*Pro Se*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRIGINIA
_____ DIVISION


NIA LUCAS & ALEXANDER MILLER II
_____
Plaintiff(s),

v.

Civil Action Number: 1:22 CV 987

VIC HEALTH AND VHC PHYSICIAN Group, LLC
_____
Defendant(s).

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of Complaint + Demand for Jury Trial
(Title of Document)

NIA LUCAS
_____
Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: 08/29/2022 (Date)

OR

The following attorney(s) prepared or assisted me in preparation of _____.
(Title of Document)

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)

2022 AUG 29 P 4: 04 FILED